**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| SITCO ENTERPRISES, LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-17-685 |
| | § | |
| TERVITA CORPORATION, *et al.*, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM AND ORDER

This contract-interpretation case arises from a rental contract for Sitco Enterprises, doing business as Summit Work Apparel, to supply Tervita Corporation, formerly known as CCS Midstream Services, with fire-resistant coveralls for oilfield-service workers. Sitco manufactures flame-resistant work apparel for the oil and gas industry; Tervita offers environmental solutions to companies in that industry. In April 2011, Summit and CCS entered into a three-year contract for Summit to rent and maintain fire-resistant coverall garments for CCS. In a June 2012 addendum, Summit and Tervita extended the contract and changed some terms. In February 2015, Republic Services acquired the U.S. division of Tervita, and, according to Summit, ratified and became a party to the contract. Tervita eventually needed fewer coveralls, which in turn affected Summit's margins. The contract expired in September 2015.

Summit sued Tervita, alleging that Tervita breached by not "tak[ing] minimum requirements of uniforms, fail[ing] to pay for uniform builds, [and] fail[ing] to reimburse allowable expenses." (Docket Entry No. 28). Tervita counterclaimed for breach of contract, fraud, fraudulent inducement, and sought an accounting. (Docket Entry No. 7).

The parties dispute the contract interpretation and Republic's status as a party to the contract. Tervita moved for summary judgment, Summit responded and cross-moved for summary judgment, and Tervita replied. (Docket Entries No. 31, 35, 38). Based on the motion, response, reply, the record, and the applicable law, the motions for summary judgment, (Docket Entries No. 31, 35), are granted in part and denied in part. The remaining issue about which there is a factual dispute is whether the minimum-billing requirement applied; summary judgment is denied as to that issue. Neither party moved for summary judgment on Tervita's counterclaims for fraud and fraudulent inducement; those claims also remain. The motion to strike Summit's cross-motion for summary judgment, (Docket Entry No. 36), is denied as moot. A pretrial conference to address the remaining work is set for **June 18, 2018, at 3:30 p.m. in Courtroom 11-D.**

The reasons for these rulings are explained below.

## I.      Background

The April 2011 contract provided for a three-year rental term requiring CCS to order at least 200 garments for the first 50 weeks; 150 garments for weeks 51 through 75; and 100 garments for the weeks after 76. The contract stated:

> **Minimum requirements**: During the term of this agreement, CUSTOMER will place Orders for the following minimum quantities of garments. (Based on installation count of 200 wearers)
>
> 100% (200) employee count through week 50
> 75% (150) employee count weeks 51-75
> 50% (100) high employee count weeks 76+
>
> The foregoing amounts are minimum guarantees and it is agreed that CUSTOMER's actual orders may exceed such amounts. In the event this Agreement is terminated by either Party in accordance with the terms hereof, CUSTOMER shall have no obligation or liability for any minimum quantity following the effective date of such termination.

(Docket Entry No. 31, Ex. A § 9.2).

The contract continued:

> Unless earlier terminated in accordance with the terms hereof, this Agreement will continue in effect until March 31st 2014 ("Term") and not be subject to tacit renewal. However, if the parties agree to extend pricing and continue to transact business beyond the term of this Agreement, the term will be extended on an interim basis until the parties execute a new agreement, extend this Agreement by amendment or continue transacting business.

(*Id.* § 4.1).

The contract also provided that Summit "will send weekly invoice[s] based upon initial sizing employee count. Invoicing count will remain until notified by CUSTOMER of employee reduction." (*Id.* § 10.2).

In a June 2012 addendum, Tervita and Summit extended the contract term for a year and changed the minimum-billing requirements:

| | |
|---|---|
| **Contract Term**: | September 1st 2012 – September 1st 2015 |
| **Unrealized depreciation of Current Inventory**: | Reduced from $500,000.00 to $350,00.00 Payment required to Summit no later than August 31, 2012 |
| **Rental rate for all US Tervita Locations** **Full Issue Employees (11 Sets)**: | $20.00 |

. . .

| | |
|---|---|
| **Loss/Replacement**: | Tervita will be responsible for costs associated with garments that have been lost or damaged beyond normal wear and tear and cannot be repaired. |

    **Weeks in service**:

| | | |
|---|---|---|
| < 10 | = | $125.00 |
| 11-50 | = | $90.00 |

| 51-75 | = | $70.00 |
| 76-104 | = | $50.00 |
| 105 | = | $0 |

**Examples**:   Employee (A) Terminates at week 105 and does not return garments to Summit.  No charge to Tervita

Employee (B) Damages Garments at week 105 and requires replacements. At end of contract, week 156.  Tervita is only responsible for buyout of garment based on L&R Schedule of 51 Weeks: $70

**Contract Min. Billing Requirements:**   (Minimum Billing will not occur previous to 800 Wearers being installed)
Based on installation count of 800 wearers
100% (800) employee count through week 50
75% (600) employee count weeks 51-75
50% (400) employee count weeks 76+

(Docket Entry No. 31, Ex. B).

The June 2012 addendum did not alter the original termination section, which provided that the seller or customer "may terminate this Agreement at any time during the Term by giving sixty (60) days' notice to the other party.  Customer is responsible to pay for garments in and out of service based upon the Exhibit B loss and replacement weeks in service."  (*Id.* Ex. A § 17.1).

In 2015, after acquiring Tervita, Republic asked Summit how much it would cost to terminate before the end of the contract term.  Summit provided an estimated buyout invoice, totaling $1,256,304.26, including a $582,520 charge for "minimum billing" for 2012 to 2015.  (*Id.* Ex. D).  Tervita alleges that, instead of paying this high buyout price, it would instead continue to rent coveralls from Summit through the end of the contract term.

The contract ended on its own terms on September 1, 2015.  The same day, Summit requested payment of the buyout invoice, which, after several revisions, totaled $1,648,288.34,

including a $521,720 charge for "minimum billing" for 2012 to 2015. (*Id.* Ex. E). In November 2017, after this lawsuit was filed and Summit's corporate representative was deposed, Summit sent Tervita a revised buyout invoice, totaling $1,504,727.19, including a $389,100 charge for "minimum billing" for 2012 to 2015 and a $751,910 charge for "Coverall TT1 (S-5X) USED." (*Id.* Ex. F). Unlike the two previous invoices, which both listed the charge for used coveralls as $329,000, the November 2017 invoice listed that charge at $751,910 with an asterisk and note stating that "[t]his number is subject to change pending review of the information provided by Republic Services on 11/29/2017." (*Id.*).

Tervita refused to pay the invoice on the grounds that the contract was for garment rentals, not garment purchases, and did not provide for a buy-back of the garments. Tervita also disputed the charges for minimum billing on the ground that the condition precedent—the installation of 800 wearers—never occurred. Summit argues that both the original contract and the July 2012 addendum required Tervita to buy back in- and out-of-service garments when the contract terminated, and that the minimum-billing charges were based on the installation count, which amounted to more than 800 wearers, rather than the employee count.

## II.     The Legal Standards

### A.      Summary Judgment

"Summary judgment is required when 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Trent v. Wade*, 776 F. 3d 3689, 376 (5th Cir. 2015) (quoting FED. R. CIV. P. 56(a)). "A genuine dispute of material fact exists when the 'evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Nola Spice Designs, LLC v. Haydel Enters., Inc.,* 783 F.3d 527, 536 (5th Cir. 2015)

(quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986)). "The moving party 'bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact.'" *Id.* (quoting *EEOC v. LHC Grp., Inc.*, 773 F.3d 688, 694 (5th Cir. 2014)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

If the burden of proof at trial lies with the nonmoving party, the movant may satisfy its initial burden by showing an absence of evidence to support the nonmoving party's case. *Fret v. Melton Truck Lines, Inc.*, 2017 U.S. App. LEXIS 16912, at *5–6 (5th Cir. Sept. 1, 2017) (quoting *Lindsey v. Sears Roebuck & Co.*, 16 F.3d 616, 618 (5th Cir. 1994)). While the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case. *Coastal Agric. Supply, Inc. v. JP Morgan Chase Bank, N.A.*, 759 F.3d 498, 505 (5th Cir. 2014) (citing *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005)). A fact is material if "its resolution could affect the outcome of the actions." *Aly v. City of Lake Jackson*, 605 F. App'x 260, 262 (5th Cir. 2015) (citing *Burrell v. Dr. Pepper/Seven UP Bottling Grp., Inc.*, 482 F.3d 408, 411 (5th Cir. 2007)). "If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response." *Pioneer Exploration, LLC v. Steadfast Ins. Co.*, 767 F.3d 503 (5th Cir. 2014).

"When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings." *Bailey v. E. Baton Rouge Parish Prison*, 663 F. App'x 328, 331 (5th Cir. 2016) (quoting *Duffie v. United States*, 600 F.3d 362, 371 (5th Cir. 2010)). The nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim. *Willis v. Cleco Corp.*, 749 F.3d 314, 317

(5th Cir. 2014).  "This burden will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'" *Jurach v. Safety Vision*, LLC, 642 F. App'x 313, 317 (5th Cir. 2016) (quoting *Boudreaux*, 402 F.3d 536, 540 (5th Cir. 2005)).  In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party.  *Darden v. City of Fort Worth*, 866 F.3d 698, 702 (5th Cir. 2017).

### B.    Contract Interpretation

In this diversity case, the court is "*Erie* bound to apply the underlying state law, that of the State of Texas."  *Wells v. Minn. Life Ins. Co.*, 885 F.3d 885, 889 (5th Cir. 2018) (citation omitted). "Contract law is an area of state law."  *Crisalli v. ARX Holding Corp.*, 177 F. App'x 417, 419 (5th Cir. 2006).  The parties do not dispute that Texas law governs this contract.

In interpreting a contract under Texas law, the court's primary concern "is to ascertain the true intentions of the parties as expressed in the instrument."  *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003).  To achieve this objective, the court considers the contract as a whole. *See id.* ("[W]e must examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless.").  When considered as a whole, a contract is ambiguous only if it is "reasonably susceptible to more than one meaning." *Lopez v. Munoz, Hockema & Reed, L.L.P.*, 22 S.W.3d 857, 861 (Tex. 2000).  "Deciding whether a contract is ambiguous is a question of law for the court."  *J.M. Davidson, Inc.*, 128 S.W.3d at 229.

When deciding whether a contract is ambiguous, "objective manifestations of intent control, not what one side or the other alleges they intended to say but did not."  *URI, Inc. v. Kleberg Cty.*, 543 S.W.3d 755, 763–64 (Tex. 2018) (citation and quotations omitted).  The court presumes "parties

intend what the words of their contract say and interpret contract language according to its plain, ordinary, and generally accepted meaning unless the instrument directs otherwise." *Id.* at 764 (citation and quotations omitted). "Even a single word can carry subtle—and significant—differences in meaning when applied to different situations." *Id.*

Courts can consider extrinsic evidence of the facts and circumstances surrounding a contract's making, but only if the surrounding facts and circumstances "provide context that elucidates the meaning of the words employed, and nothing else." *Id.* at 765. "Understanding the context in which an agreement was made is essential in determining the parties' intent as *expressed in the agreement*, but it is the parties' expressed intent that the court must determine." *Anglo–Dutch Petrol. Int'l, Inc. v. Greenberg Peden, P.C.*, 352 S.W.3d 445, 451 (Tex. 2011).

Contract ambiguity may be patent or latent. *URI*, 543 S.W.3d at 765. Patent ambiguity occurs when the contract is ambiguous on its face. *Id.* Latent ambiguity occurs when a contract is clear on its face, but extrinsic evidence may lead a court to find a provision ambiguous. *Id.* To explain this difference, the Texas Supreme Court has used the example of a contract that requires a party to deliver goods "to the green house on Pecan Street." *Nat'l Union Fire Ins. of Pittsburgh v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 n.4 (Tex. 1995). On its face, this contract has no patent ambiguity because the plain language is clear. But, if extrinsic evidence shows that there are two green houses on Pecan Street, the court may find a latent ambiguity. *Id.* If extrinsic evidence shows that the parties intended the goods be delivered to the blue house on Pecan Street, the court cannot use the evidence of two green houses to determine that the contract is ambiguous. The evidence creates rather than reveals ambiguity, and contradicts the parties' plainly expressed intent. *Id.* Because of this distinction, a court may decide that a contract has a latent ambiguity only if extrinsic

evidence "illuminates [the] contract language" but does not "add[] to, alter[], or contradict[] the contract's text." *URI*, 543 S.W.3d at 767.

## III. Analysis

### A. Whether the Contract Requires a Buy-Back

Under the contract, Summit was to rent flame-resistant coveralls and bibs to Tervita for three years. The parties disagree about whether Tervita was supposed to buy back the rented garments when the contract term ended. Both parties argue that the contract is unambiguous. Tervita argues that the contract contains no buy-back provision and was only a rental contract. Summit argues that the contract contains a buy-back provision, making it a rental and purchase contract. Alternatively, Summit argues that the contract is ambiguous, creating a fact issue for a jury.

The contract is titled "Supply Agreement Between Summit Work Apparel, a Division of SITCO LLC And CCS Midstream Services LLC." (Docket Entry No. 31, Ex. A at 1). The "scope of work" included "[g]arments, [c]leaning [and] [r]ental [s]ervices." (*Id.* at 9). The contract defines goods as "garments, cleaning and rental services," (*Id.* § 1.6), and specifies that it "does not establish a quantity of [g]oods to be purchased by [Tervita]." (*Id.* § 1.12). In the pricing section, Tervita "agrees to rent from [Summit]." (*Id.* § 5.1). In the delivery and performance section, Summit "shall provide [Tervita] with garments and/or other rental items . . . freshly processed, mended, and finished in accordance with generally accepted standards of the textile rental industry. [Summit] will replace any Merchandise requiring replacement due to normal wear and tear at no charge to [Tervita]. All property shall remain the property of [Summit]." (*Id.* § 6.2). The contract's "special terms" required Tervita to return garments to Summit when Tervita's employee count decreased and that "[a]ny garments not returned to [Summit] within 20 days [would] be billed loss

rate as defined by Loss and Replacement rates . . . ." (*Id.* § 10.2). These terms describe garment rentals, not garment purchases.

The termination section gives either party the option to end the contract during the contract term by giving 60 days written notice to the other party. That section specifies that Tervita "is responsible to pay for garments in and out of service based upon the Exhibit B loss and replacement weeks in service." (*Id.* § 17.1). The section also describes three ways that Summit could breach. Attached to each of those descriptions is, again, the phrase that Tervita "is responsible to pay for garments in and out of service based upon the Exhibit B loss and replacement weeks in service." (*Id.* §§ 17.3, 17.4, 17.5). Exhibit B of the original contract listed the monthly rental price for each garment set. (*Id.* at 10). In a separate section, it also listed a "purchase option" next to the full coverall sales prices. (*Id.*). Exhibit B's loss-and-replacement schedule provides:

> [Tervita] will be responsible for costs associated with garments that have been lost or damaged beyond normal wear and tear and cannot be repaired.
>
> Replacement value below.
>
> Weeks in Service.    <10   =    $125.00
>                                  11-50  =    $90.00
>                                  51-75  =    $70.00
>                                  76-102 =    $50.00
>                                  105+   =    $0

(*Id.* at 11).

The June 2012 addendum did not change the loss-and-replacement schedule. Instead, it added two examples explaining that schedule:

> Employee (A) Terminates at week 105 and does not return garments to Summit. No charge to Tervita.

> Employee (B) Damages Garments at week 105 and requires replacements. At end of contract, week 156. Tervita is only responsible for buyout of garment based on L&R Schedule of 51 Weeks: $70.

(*Id.* Ex. B at 1).

Interpreting the contract as a whole, giving meaning to all of the provisions, leads to the conclusion that it does not include a buy-back requirement. Summit expressed its intent in the scope-of-work section to provide "garments, cleaning, and rental services." The contract language repeatedly uses "rental" to describe the parties' transaction. The pricing section describes Tervita's obligation to "rent" from Summit. The contract did not list additional obligations for Tervita to buy back or purchase Summit's garments at the end of the contract; contract obligations do not exist unless they are plainly specified. *See Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 134 (Tex. 1994) (an insurance policy stating that it was responsible for benefits under the policy "while coverage was in force" did not create an obligation to provide for future expenses associated with an accident that occurred during the policy).

Although the contract does list the full purchase price of Summit's coveralls, this is listed as a "purchase option," giving Tervita a choice, but not an obligation, to buy Summit's coveralls. A buy-back provision would be inconsistent with the loss-and-replacement section, which applies charges only for garments "that have been lost or damaged beyond normal wear and tear." (Docket Entry No. 31, Ex. B at 1).

The contract language undermines Summit's argument that the termination provisions created a buy-back obligation. Summit points to the sentence used in several of the termination provisions that Tervita "is  responsible to pay for garments in and out of service based upon the Exhibit B loss and replacement weeks in service." A plain reading of this sentence indicates that

Tervita must pay for garments as specified in Exhibit B, which is limited to garments "lost or damaged beyond normal wear and tear and cannot be repaired." (*Id.*). Summit's proposed interpretation would require Tervita to pay for *all* garments at the end of the contract, not just those damaged beyond normal wear and tear. This interpretation would effectively write in an obligation that is inconsistent with the contract language. *See Universal Health Servs., Inc. v. Renaissance Women's Grp., P.A.*, 121 S.W.3d 742, 746–47 (Tex. 2003) (a lease contract for a hospital did not require owners to operate the hospital during the entire term of the lease because this obligation was not specified in the contract).

Even if the termination section imposed a buy-back obligation, that obligation would apply only if the contract were terminated in one of the ways specified in section 17. The language that "the Customer is responsible to pay for garments in and out of service" is listed only in sections 17.1, 17.3, 17.4, and 17.6, which set out the methods by which either party could terminate the contract early, by providing 60 days written notice or by materially breaching. Summit argues that this obligation applies to *any* termination of the contract, either early or based on the end of the contract term. The contract language unambiguously contradicts that interpretation. The language requiring Tervita to pay for in- and out-of-service garments is listed only in the sections setting out the methods for ending the contract early. Summit relies on section 5.2, which provides that "[i] the parties do not agree on pricing for the next Pricing Period, this Agreement will terminate at the end of the then current Pricing Period." (Docket Entry No. 31, Ex. A § 5.2). But unlike sections 17.1, 17.3, 17.4, and 17.6, section 5.2 does not contain the language that the customer must pay for in- and out-of-service garments. That requirement is limited to the circumstances in the provisions set out in section 17. The parties do not allege that a condition set out in section 17 occurred, and do not

dispute that the contract ended by its own terms in September 2015. To the extent the contract contained a buy-back provision, that provision is limited to the early-termination provisions and does not apply to the facts alleged here.

Summit also relies on the phrase "in and out of service garments." According to Summit, because out-of-service garments are either garments not yet placed in service by Summit, or garments that have been returned by terminated Tervita workers, those garments cannot be lost or destroyed. Because the in- and out-of-service garments cannot be lost or destroyed, the loss-and-replacement schedule controls for the garments that needed to be bought back. But a terminated worker returning a uniform may have damaged it. Additionally, the contract obligation for terminated workers to return garments to Summit is inconsistent with Summit's interpretation that Tervita was eventually obligated to purchase, not just rent, all garments.

Summit also points to the examples in the loss-and-replacement section of the June 2012 addendum. In the first example, a Tervita employee is terminated after 105 weeks of work and does not return his garments to Summit. Tervita is not required to pay anything. Read with the loss-and-replacement section, this would mean that because the garment was not "lost or damaged beyond normal wear and tear," but rather was kept by a terminated employee, Tervita did not need to pay Summit. Under Summit's interpretation, this would mean that because the employee had worked for 105 weeks, Tervita would have essentially paid for the garment and owed no remaining money for the full purchase price. This interpretation is not reasonable in light of section 6.2, which requires that "[a]ll property shall remain the property of [Summit]," whether at week 10 in the contract or at week 105. (Docket Entry No. 31, Ex. A § 6.2).

Summit also relies on the second example, the only place in the contract that uses the word "buyout." In that example, a Tervita employee damages his garments after wearing them for 105 weeks. Because the employee will need replacement garments to wear in the 51 weeks remaining in the contract term, Tervita must pay Summit $70. Under Summit's interpretation, Tervita would pay a monthly rental cost for the replacement garment for the remaining 51 weeks and would owe $70 as the buy-back price instead of the full $119 purchase price. Under Tervita's interpretation, the $70 is owed as a penalty that decreases based on how long the replacement garment was used in service for the remainder of the contract. Tervita's interpretation is the only reasonable one based on the contract as a whole and the placement of the example within the loss-and-replacement section.

Summit also argues that facts and circumstances present in the summer of 2012 affect the contract interpretation. According to Summit, Tervita purchased CCS, the original contracting party, and wanted to rent garments with different colors. Because of the large cost of switching uniforms and the amount of inventory Summit had accumulated in the previous color, the parties stated the following in the contract amendment:

Unrealized depreciation of Current Inventory: Reduced from $500,000.00 to $350,000.00. Payment required to Summit no later than August 31, 2012.

(*Id.* Ex. B at 1).

Summit argues that this shows that Tervita agreed to buy back garments at the end of the contract term because it did so after the garment color changed in an earlier contract. Although extrinsic facts and circumstances can illuminate a contract's meaning, extrinsic facts and circumstances cannot create ambiguity. The prior contract language requiring Tervita to pay for the

garment color change cannot be used to create an unstated buy-back obligation in a the later, different contract. The use of extrinsic evidence would improperly create ambiguity rather than reveal it.

Finally, Summit points to section 3.1 in support of its interpretation that the contract included a buy-back obligation. That section states:

> There will be a one-time charge for name and/or company emblems when employees are added to the program in garments requiring emblems. Emblem charges are detailed on Exhibit B.

(*Id.* Ex. A § 3.1). This section specifies that Tervita had to pay for company emblems on garments. No other provision requires Tervita to pay for bibs and coveralls that have no emblem added, or for anything but the emblem charge. The emblem specifications and charges were also listed in a separate section in the amended Exhibit B, not within the loss-and-replacement section.

Under Summit's interpretation, a contract without an express buy-back provision would require a buy-back obligation. Because there is no express buy-back provision, and the context does not support a buy-back obligation, the contract unambiguous: there is no buy-back provision for coveralls and bibs.

Tervita's motion for summary judgment on this issue, (Docket Entry No. 31), is granted, and Summit's motion for summary judgment on this issue, (Docket Entry No. 35), is denied.

### B.      Whether the Minimum-Billing Requirement Applies

The original contract had a minimum-billing requirement that applied based on an installation count of 200 wearers:

> **Minimum requirements**: During the term of this agreement, CUSTOMER will place Orders for the following minimum quantities of garments. (Based on installation count of 200 wearers)

100% (200) employee count through week 50
75% (150) employee count weeks 51-75
50% (100) high employee count weeks 76+

> The foregoing amounts are minimum guarantees and it is agreed that CUSTOMER's actual orders may exceed such amounts. In the event this Agreement is terminated by either Party in accordance with the terms hereof, CUSTOMER shall have no obligation or liability for any minimum quantity following the effective date of such termination.

(Docket Entry No. 31, Ex. A § 9.2). This meant that, for the first 50 weeks of the contract term, Tervita was required to pay Summit $28.50 per employee, for 200 employees, totaling $5,700 per week, even if Summit outfitted fewer than 200 employees with uniforms in a particular week. During weeks 51 through 75, Tervita was required to pay Summit $28.50 per employee, for 150 employees, totaling $4,275 per week. During weeks 76 and beyond, Tervita was required to pay Summit $28.50 per employee, for 100 employees, totaling $2,850. In any week in which Summit outfitted *more than* 200, 150, or 100 employees, respectively, the minimum-billing requirement did not apply. In those weeks, Tervita would instead pay Summit $28.50 per employee, times the number of employees outfitted with uniforms.

The June 2012 addendum changed the terms by lowering the per-employee cost of uniforms from $28.50 to $20.00, and by changing the minimum-billing requirement as follows:

**Contract Min. Billing Requirements:**    (Minimum Billing will not occur previous to 800 wearers being installed)
Based on installation count of 800 wearers.
100% (800) employee count through week 50
75% (600) employee count weeks 51-75
50% (400) high employee count weeks 76+

(*Id.* Ex. B). Under the addendum, the minimum-billing requirement applied only after Summit outfitted 800 employees with uniforms. The parties agree that the addendum created a condition precedent, "Minimum Billing will not occur previous to 800 Wearers being installed," designed to

16

delay the implementation of the minimum-billing requirement. But the parties dispute the meaning of the term, "previous to 800 Wearers being installed."

Tervita argues that the condition precedent did not occur because Tervita did not have 800 active employees during the contract term. In support, Tervita cites a spreadsheet it sent to Summit listing its active employees by location, showing a high of 700 employees, and a low of 143 employees. (*Id.* Ex. H). Tervita also cites the deposition testimony of Miriam Mondragon, a Summit employee who sent bills to Tervita, as evidence that Summit did not bill Tervita for more than 800 employees. (*Id.* Ex. K). Finally, Tervita cites the deposition testimony of Alan Habash, Summit's corporate representative, that "[o]n a weekly active employee invoice, we never sent a bill for 800 active employees." (*Id.* Ex. C). According to Tervita, these show that it did not have 800 employees any time between June 2012 and September 2015.

In response, Summit argues that the installation count, rather than the active-employee count, surpassed 800 and entitles it to minimum-billing payments. Summit argues that employees were "installed" in the program when "a wearer [was] initially placed in the system and issued his first set of 11 garments from Summit." (Docket Entry No. 35 at 16). Installation count referred to "the number of employees who had been installed in the program at any time, whether they remained in the program for the life of our contract or not." (*Id.* Habash Declaration).

The installation count was necessarily higher than the active-employee count because Tervita had high turnover rates at its five different sites. Tervita regularly sent Summit lists of employees who had been hired, fired, re-hired, and re-fired, so that Summit could keep track of its uniform inventory, reclaim uniforms from terminated employees, and outfit new employees with uniforms. (*Id.* Exs. 3–7). If Tervita fired an employee, that employee would remain on the "installation count"

17

but would be removed from the "employee count," the count on which Summit charged Tervita for uniform rentals and laundry services.

Summit argues that the parties agreed to tie the minimum-billing requirement to the installation count rather than to the employee count because, when the addendum was signed in June 2012, the installation count was just above 700 and would continue to rise in a predictable way, while also providing Tervita a few months of relief from that requirement. According to Summit, the installation count reached 800 during the week of March 22, 2013. In support, Summit cites the declaration of Alan Habash and a spreadsheet, which Summit alleges was created by Tervita, titled "SIT01702_Tervita Active and Termed Employee Install List 2013" that lists all Tervita employees who had been outfitted with uniforms and the dates they were outfitted with and wore those uniforms. (*Id.* Ex. 9). Tervita does not dispute that it created and provided this list to Summit, or that the installation count surpassed 800 during the week of March 22, 2013.

Summit points to the fact that the terms "800 Wearers being installed" and "Based on installation count of 800 wearers," appear on separate lines in the addendum, immediately before the payment schedule based on "employee count." According to Summit, this made sense because the installation count was used to trigger liability for minimum billing, whereas the active-employee count was used to describe the liability scope. Summit also argues that the earlier version of the contract, which expressly used the term "installation count of 200 wearers," shows the parties' intent to use the installation count for the minimum-billing requirement in the June 2012 addendum, which states that the minimum-billing schedule is "[b]ased on installation count of 800 wearers." Summit argues that Tervita's proposed interpretation conflates the two terms.

The contract does not indicate whether the condition precedent—that "Minimum Billing will not occur previous to 800 Wearers being installed"—refers to the employee count or the installation count. Nor does the contract define "installed wearers." The parties argue conflicting interpretations. Tervita argues that "800 Wearers being installed" means 800 active employees wearing uniforms; Summit argues that "800 Wearers being installed" refers to the installation count.

The summary judgment record shows conflicting facts about when or whether the minimum-billing requirement was triggered. Summit cites Tervita-created spreadsheets setting out the installation count, which reached 800 in March 22, 2013, (Docket Entry No. 35, Ex. 9), as well as a spreadsheet setting out the active-employee count that includes a table with the minimum-billing schedule listed as starting on March 22, 2013, (Docket Entry No. 31, Ex. H). On the other hand, supporting Tervita's interpretation, Tervita's active-employee count never reached 800, (Docket Entry No. 31, Ex. H), and the deposition testimony of Alan Habash shows that, even after the minimum-billing requirement should have been triggered in March 2013, Summit's monthly invoices to Tervita did not include minimum-billing charges, (*Id.* Ex. C ("Q. From 2011 through 2014, are you aware of any monthly minimum billing invoice that was sent? A. I'm not aware of any monthly minimum.")). The meaning of the term "800 Wearers being installed" is ambiguous because whether that term referred to the weekly count of employees wearing uniforms or to the total installation count of employees Summit had outfitted with uniforms is "reasonably susceptible to more than one meaning." *Lopez*, 22 S.W.3d at 861. Because the minimum-billing provision is ambiguous, "summary judgment is improper because the interpretation of the instrument becomes a fact issue." *Holmes v. Newman*, 2017 WL 2871786 (Tex. App.—Houston [1st Dist.] July 6, 2017) (quoting *Coker v. Coker*, 650 S.W.2d 391, 394 (Tex. 1983)).

On this issue, and on this record, the motions for summary judgment, (Docket Entries No. 31, 35), are denied.

**C.      Whether Republic Ratified the Contract**

In 2015, Republic purchased Tervita by a "Purchase and Sale Agreement by and among Republic Services, Inc., as Buyer Parent Republic Services of Florida, Limited Partnership, as Buyer, and Tervita (USA), Inc., as Seller." (Docket Entry No. 31, Ex. J). In February 2015, Republic sent Summit a letter stating:

> As you may have heard, Republic Services, Inc. has entered into an agreement to acquire the U.S. portion of Tervita, LLC. The parties contemplate that the transaction will be closed prior to mid-February 2015. Since you may have questions about the transition on your business relationship with Tervita, LLC, we wanted to take this opportunity to advise you of the following, all to be effective upon closing:
>
> •      Since the transaction was structured as an equity purchase, Tervita, LLC is still the contracting party under your agreement;
>
> •      All terms and conditions contained in your agreement with Tervita, LLC remain in full force and effect;
>
> •      All existing purchase orders, including any terms and conditions contained therein, will remain in full force and effect;
>
> •      Any previously submitted invoices that have not been paid will be paid by Tervita, LLC in accordance with the terms of its agreement with you;
>
> . . .
>
> •      New purchase orders will continue to be issued by the same individuals who issued them previously; however, the PO numbering sequence will be different;
>
> •      Following closing, any questions regarding purchase orders should be directed to the local Republic Energy Services, formerly known as Tervita, LLC site where the PO initiated . . . . We look forward to your continued relationship with Tervita, LLC.

(Docket Entry No. 35, Ex. 16).

In June 2015, Republic sent a follow-up letter stating:

This is a follow-up to the communication published in February regarding the acquisition of the U.S. Portion of Tervita, L.L.C. by Republic Services. Suppliers must adhere to all Republic Services Procurement policies. Failure to follow Procurement policies will result in non-payment of orders and will jeopardize your future business with Republic Services.

Republic Services Procurement Policy requires the following.

1. Suppliers are not to deliver goods or services unless authorized to do so pursuant to the terms of a valid purchase order, unless payment is authorized using an approved Republic Services Purchasing Card and associated terms and conditions. Failure to obtain a valid purchase order number before goods are shipped or services performed will result in non-payment from Republic Services.

2. Each acquired Tervita site will have a designated PO assigner. Only the designated PO assigner can place a valid purchase order with a supplier.

3. To receive payment of your invoices, supplier invoices must include and reference the applicable purchase order number. . . .

(*Id.* Ex. 17).

Tervita moved for summary judgment that Republic is not a party to the contract because Tervita never assigned the contract to Republic. According to Tervita, "Republic merely owns the stock of Tervita," is not an alter ego of Tervita, and did not explicitly or implicitly ratify the contract between Summit and Tervita. (Docket Entry No. 31 at 19). Summit responds that Republic became a party to the contract by ratifying and performing it. Summit points to evidence showing that Republic was aware of the contract when it acquired Tervita and that Republic managed interactions with, negotiated purchase orders, and wrote checks to Summit for its services. (Docket Entry No. 35 at 20–22).

Tervita's argument that Republic is not liable based on its status as the parent of Tervita is unpersuasive. Although "subsidiaries are distinct from parent companies because parent companies are simply shareholders that do not own an interest in the business of the companies in which they hold stock," *Cadena Comm. USA Corp. v. Tex. Alcoholic Beverage Comm'n*, 518 S.W.3d 318, 332 (Tex. 2017), Republic performed the contract obligations and accepted the benefits. It issued purchase orders to Summit, paid Summit's invoices for the contract services, and attempted to negotiate a buy-out and the early termination of the contract. (Docket Entry No. 35, Ex. 3) (testimony that Republic, before acquiring Tervita, obtained and reviewed a preliminary copy of the addendum); (Exs. 4, 5) (invoice for early termination of the contract and correspondence between Republic and its counsel about the contract); (Ex. 6) (an email chain between a Republic employee and Summit's Vice President of Sales and Marketing discussing the buyout invoice); (Ex. 7) (a letter from Republic to Summit disputing charges and seeking to settle the dispute); (Ex. 9) (an email stating that "Loren Franklin [Republic's sourcing manager] with corporate is coordinating the ending of the contract. We cannot do anything locally as it may interfere with the settlement that is in the works."); (Ex. 18) (checks from Republic Services International to Summit International for purchase orders and services under the contract). By performing the contract obligations, Republic ratified the contract and may be held liable under it. *See Stable Energy v. Newberry*, 999 S.W.2d 538, 548 (Tex. App.—Austin 1999) ("Ratification of a contract occurs when a party recognizes the validity of the contract by acting under the contract, performing under the contract, or affirmatively acknowledging the contract." (collecting authority)); *see also Chopra & Assocs., PA v. U.S. Imaging, Inc.*, 2014 WL 7204868, at *3 (Tex. App.—Houston [14th Dist.] Dec. 18, 2014) ("A party cannot avoid an agreement by claiming there was no intent to ratify after that party has accepted the benefits of the agreement.").

On this issue, Summit's motion for summary judgment, (Docket Entry No. 35), is granted and Tervita's motion for summary judgment, (Docket Entry No. 31), is denied.

**IV.     Conclusion**

The motions for summary judgment, (Docket Entries No. 31, 35), are granted in part and denied in part. The remaining issue about which there is a factual dispute is whether the minimum-billing requirement applied; summary judgment is denied as to that issue. Neither party moved for summary judgment on Tervita's counterclaims for fraud and fraudulent inducement; those claims also remain. The motion to strike the cross-motion for summary judgment, (Docket Entry No. 36), is denied as moot. A pretrial conference to address the remaining work is set for **June 18, 2018, at 3:30 p.m. in Courtroom 11-D.**

SIGNED on June 11, 2018, at Houston, Texas.

Lee H. Rosenthal
Chief United States District Judge